**Commonwealth v. Keenan**

C.P. of Berks County, no. CP-06-CR-523-09.

*Catherine J. Nadirov,* for the Commonwealth.
*Christopher M. Brett,* for the defendant.

LUDGATE, *J.*, March 16, 2010—The matter before the court is the defendant's direct appeal from judgment of sentence. The court adopts and incorporates its findings of fact and conclusions of law issued June 10, 2009.

## I. PROCEDURAL AND FACTUAL HISTORY

On June 18, 2009, Jessie Keenan (defendant) was charged by information with arson, 18 Pa.C.S. §3301(a)(1)(i), arson, 18 Pa.C.S. §3301(a)(1)(ii), arson, 18 Pa.C.S. §3301(c)(1), 18 Pa.C.S. §3301(c)(2), causing or risking catastrophe, 18 Pa.C.S. §3302(b), criminal mischief, 18 Pa.C.S. §3304(a)(1) and recklessly endangering another person, 18 Pa.C.S. §2705.

On June 9, 2009, the court held a hearing on the defendant's omnibus pretrial motion. On June 10, 2009, the court issued findings of fact and conclusions of law and denied the defendant's suppression and habeas corpus claims.

On September 23, 24 and 25, 2009, the court held a jury trial. At trial, the Commonwealth presented the testimony of Officer Eric Driesbach of City of Reading Police Department. (N.T. 9/23/2009-9/25/2009, p. 9.) Officer Driesbach testified that on June 18, 2006 at approximately 10:45 p.m., he was walking to his patrol car near city hall when he heard two loud bangs or explosions. (N.T. pp. 9-10.) Officer Driesbach observed smoke and flames at the corner of 9th and Washington Streets, one-half block from city hall. (N.T. p. 10.) Officer Driesbach observed a white male walking north on Cedar

Street; another officer on a motorcycle motioned with his arms, which Officer Driesbach interpreted to mean the white male should be stopped. (N.T. pp. 10-11.) By the time Officer Driesbach reached the white male, other officers had already approached the white male; no one else was outside in the intersection of Cedar and Washington Streets. (N.T. p. 11.) Officer Driesbach said the building at 9th and Washington Streets was engulfed in flames when he arrived at the scene, and he had left city hall only 30-45 seconds before arriving. (N.T. p. 13.) Officer Driesbach testified that he was scared but felt comfortable once the fire department arrived. (N.T. p. 14.)

Officer Arnold Labella testified that he is a police officer with the Reading Police Department. (N.T. p. 18.) On June 19, 2006, Officer Labella was riding his motorcycle towards city hall to work the midnight patrol shift. (N.T. p. 18.) At that time, Officer Labella heard an explosion and observed the building at 9th and Washington Streets to be on fire. (N.T. pp. 18-19.) Officer Labella observed a large white male walking from an alleyway towards Washington Street. (N.T. p. 19.) No one else was in the area at that time. (N.T. p. 20.)

Sergeant Marc Pentheny testified that he is employed by the Reading Police Department and was working on June 18, 2006. (N.T. p. 22.) At approximately 11 p.m., Sergeant Pentheny was leaving city hall at the conclusion of his shift when he received a call for an explosion and fire at 9th and Washington Streets. (N.T. p. 23.) While walking to the scene, Sergeant Pentheny ran into a male

who was staggering, incoherent and had been severely burned; Sergeant Pentheny assumed the male was a victim of the fire. (N.T. pp. 23-24.) The male was identified as the defendant. (N.T. p. 24.) Once emergency medical personnel got to the defendant, Sergeant Pentheny went to the scene of the fire. (N.T. p. 25.)

Officer Matthew Schappell testified that he is employed by the Reading City Police Department and was so working on June 19, 2006. (N.T. p. 27.) Officer Schappell responded to a fire at North 9th and Washington Streets; upon his arrival, paramedics asked Officer Schappell to drive their ambulance to Reading Hospital because an individual who was injured in the fire required the attention of both paramedics. (N.T. p. 28.) Officer Schappell drove the ambulance to Reading Hospital then returned to city hall; Officer Schappell returned to Reading Hospital to stay with the individual who was injured in the fire. (N.T. p. 28.) That individual was the defendant. (N.T. p. 29.) Officer Schappell collected the clothing the defendant was wearing when he arrived at the hospital, consisting of pairs of pants, boots and socks. (N.T. p. 29.) Officer Schappell turned the clothing over to Officer Naugle, an evidence technician. (N.T. p. 29.)

Thomas Kemmery testified that he is employed by the City of Reading Fire Department. (N.T. p. 33.) Mr. Kemmery is a firefighter and registered nurse with specialty in pre-hospital care. (N.T. p. 38.) Mr. Kemmery responded to the fire at 9th and Washington Streets on June 18, 2006. (N.T. pp. 33-34.) At that time, Mr. Kemmery came into contact with the defendant, who was badly

burned. (N.T. p. 36.) The defendant had burns to about 55 percent of his body including his torso, face, arms, left upper leg; the defendant also had injury to his breathing passages as a result of fire. (N.T. p. 39.) Mr. Kemmery testified that injury to breathing passages indicates a person was in close proximity to a fire because inhaling radiant heat can cause redness and swelling of the soft tissue inside the nose, throat and mouth. (N.T. pp. 39-40.)

Dale Kite testified that in June of 2006 he was living in an apartment at 839 Washington Street, Reading, Berks County, Pennsylvania; this address is two doors away from Sunny's Steaks, which is at the corner of 9th and Washington Streets. (N.T. p. 52.) Mr. Kite testified that on June 18, 2006 there was a large explosion which knocked a clock off his wall. (N.T. p. 53.) Mr. Kite looked out his window to the roof of 841 Washington Street; at that time, Mr. Kite heard a male voice say something to the effect of "which way do I go" or "where do I go." (N.T. pp. 53, 55.) Mr. Kite said it is possible to get to the roof of 841 Washington from the roof of Sunny's Steaks. (N.T. pp. 54-55.) Mr. Kite went out his front door to Washington Street and saw a pile of bricks that were burning; the bricks came down from the second floor of the restaurant. (N.T. pp. 55-56.) Mr. Kite helped neighbors get out of 841 Washington Street, which contained three apartments, including George Butler, who had heart problems. (N.T. pp. 56-58.) While going to find his neighbors, Mr. Kite saw the defendant and recognized him as the source of the voice he heard on the roof. (N.T. pp. 58-59.) The defendant was known to Mr. Kite because

the defendant had been a cook at Sunny's Steaks, a restaurant Mr. Kite frequented, and Mr. Kite did odd jobs for the defendant and the owner of the restaurant. (N.T. pp. 60-62.)

Richardo Pena testified that in 2006 he worked with his father-in-law managing his properties. including 100 and 102 North 9th Street. (N.T. p. 66.) Mr. Pena's father-in-law sold a restaurant at that location to John Thomas, who began operating the restaurant as Sunny's Steaks. (N.T. p. 67.) Before transferring the property to Mr. Thomas, Mr. Pena cleaned out the second and third floors above the restaurant; the floors did not contain drywall or gas or electric utilities. (N.T. pp. 68-69.) There is no way to access the second and third floors from the first floor restaurant; those floors are only accessible through the roof. (N.T. p. 69.) Mr. Pena identified the defendant, whom he recognized because the defendant had worked for John Thomas at a different restaurant. (N.T. pp. 70-71.)

Officer Michael Dobrosky testified that in 2006 he was employed as an evidence technician for the City of Reading Police Department. (N.T. p. 84.) Officer Dobrosky photographed the scene and collected evidence on June 19, 2006, following the fire. (N.T. p. 84.) Officer Dobrosky collected a glove found in an alley between North 9th and Cedar Streets. (N.T. pp. 86, 271, 285.) The glove from the alley was Commonwealth's exhibit 8. (N.T. p. 87.) A matching glove was found on the roof of the building; the glove in the alley was left-handed, the glove on the roof was right-handed. (N.T. pp. 89-90, 295.) A pair of glasses was found on the same roof, near the glove.

(N.T. pp. 90, 293.) Officer Dobrosky also found a duffle bag containing plastic gasoline cans inside the building and a hat on Washington Street. (N.T. pp. 92-94.)

Detective Ivan Martinez testified that he is employed by the City of Reading Police Department. (N.T. p. 188.) Detective Martinez obtained PennDOT records indicating the defendant is required to wear corrective lenses. (N.T. p. 190.)

Todd Iaeger testified that he is employed as Fire Marshal by the City of Reading Department of Fire and Rescue Services. (N.T. p. 105.) On June 18, 2006, Mr. Iaeger responded to the fire at North 9th and Washington Streets. (N.T. pp. 105-106.) Mr. Iaeger assisted Officer Dobrosky in collecting a sample of wood baseboard from the second floor of the building. (N.T. pp. 107-108.)

Mr. Iaeger was qualified as an expert witness in the area of fire investigation, origin and cause. (N.T. p. 132.) Mr. Iaeger concluded the fire was started by incendiary means, meaning it was a set fire. (N.T. p. 174.) Mr. Iaeger's conclusion was based upon exclusion of all other possible ignition sources and the presence of gasoline and gasoline containers. (N.T. p. 176.)

The Commonwealth and defendant entered into the following two stipulations, which were read to the jury:

"(1) On June 18, 2006, Officer Scott Naugle of the Reading Police Department secured Commonwealth's exhibits 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19.

"(2) A liquid sample, using gauze pads, was taken from each of the red plastic gas cans, which were collectively

marked as Commonwealth's exhibits 11, on June 18, 2006 by Officer Scott Naugle. Officer Naugle of the Reading Police Department then took possession of the sample and stored it in a secured evidence locker. The samples were not altered or tampered with in any way.

"(3) On July 21, 2006, Forensic Scientist Jessica J. Oberle retrieved the items from the secure evidence area and conducted trace evidence analyses. She then prepared lab report B06-03152-1, also identified as Commonwealth's exhibit 22.

"(4) Ms. Oberle tested the items using standard scientific tests and practices.

"(5) Ms. Oberle is an expert in trace evidence analyses and is qualified to render an opinion as to the presence of trace evidence, including the presence of ignitable liquids.

"(6) If called to testify, Ms. Oberle would state, to a reasonable degree of scientific certainty, the following:

"(a) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 17; and

"(b) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 18; and

"(c) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 19; and

"(d) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 15, a right black Timberland boot; and

"(e) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 14, left black Timberland boot; and

"(f) no common ignitable liquid was identified on Commonwealth exhibit 16, black socks,

"(g) no common ignitable liquid was identified on Commonwealth exhibits 12 and 13, two parts of a pair of black sweatpants; and

"(h) gasoline, an ignitable liquid was identified on the gauze pad sample from Commonwealth exhibit 10, charred wood.

"(7) The Pennsylvania State Police Lab at Bethlehem is approved to conduct trace evidence analyses, which includes the examination of items for the presence of ignitable liquids.

"(8) At each and every one of the labs the samples were logged and stored in a secure evidence area, and were not altered or tampered with in any way.

"(9) All evidence was returned to the custody of the Reading Police Department, where it was stored in a secure facility and was brought to court for this trial. The evidence has not been altered, and the chain of custody has remained intact at all times." (N.T. pp. 121-23, 238-39.)

"(1) On June 19, 2006 Officer Michael Dobrosky of the Reading Police Department secured Commonwealth's exhibits 8 and 9.

"(2) A DNA sample, Commonwealth's exhibit 20 was taken from the defendant, Jessie Keenan, on December

16, 2008 by Officer Eric Hartman, and witnessed by Criminal Investigator Harold Shenk of the Reading Police Department. Officer Kirby Hartzell, of the Reading Police Department, then took possession of the sample and stored it in a secure evidence refrigerator. The sample was not altered or tampered with in any way.

"(3) On March 15, 2009, Forensic Scientist Sabine Panzner-Kaelin, Pennsylvania State Police Laboratory at Greensburg, retrieved the DNA sample from the secure evidence area and ran a DNA comparison. She then prepared lab report B06-03152-6, also identified as Commonwealth exhibit 23.

"(4) Ms. Panzner-Kaelin tested the items using standard scientific tests and practices.

"(5) Ms. Panzner-Kaelin is an expert in DNA analysis and is qualified to render an opinion as to DNA comparison.

"(6) If called to testify, Ms. Panzner-Kaelin would state, to a reasonable degree of scientific certainty the following:

"(a) that the DNA found in the sample from Commonwealth exhibit 8 matches the known sample of DNA from the defendant Jessie Keenan; and

"(b) that the probability of randomly selecting an unrelated individual exhibiting this combination of DNA types is 1 in 7.3 quintillion from the Caucasion population.

"(7) The Pennsylvania State Police Lab at Greensburg is approved by the Commonwealth to conduct DNA analysis.

"(8) At each and every one of the labs the samples were logged and stored in a secure evidence area, and were not altered or tampered with in any way.

"(9) All evidence was returned to the custody of the Reading Police Department, where it was stored in a secured facility and was brought to court for this trial. The evidence has not been altered, and the chain of custody has remained intact at all times.

"(10) The laboratory reports generated in regards to the DNA analysis are attached to this stipulation as exhibit 24." (N.T. pp. 124-25, 240-41.)

On September 25, 2009, the defendant was found guilty of arson, 18 Pa.C.S. §3301(a)(1)(i), arson, 18 Pa.C.S. §3301(a)(1)(ii), arson, 18 Pa.C.S. §3301(c)(1), 18 Pa.C.S. §3301(c)(2), causing or risking catastrophe, 18 Pa.C.S. §3302(b), criminal mischief, 18 Pa.C.S. §3304(a)(1) and recklessly endangering another person, 18 Pa.C.S. §2705.

On October 9, 2009, the defendant was sentenced to a total of 57 months to 37 years incarceration in a state facility. On October 19, 2009 the defendant filed post-sentence motions through counsel, which were denied October 20, 2009.

On November 17, 2009, the defendant filed a notice of appeal through counsel. On November 19, 2009, this court ordered counsel for the defendant to file a concise statement of errors complained of on appeal within 21 days. On December 9, 2009, counsel timely filed the concise statement. Trial transcripts were lodged on January 22, 2010.[1]

---

1. The notice of lodging transcript of record reflects that the transcript was lodged on January 8, 2009. This date is incorrect for two

This opinion is written pursuant to Pa.R.A.P. 1925(a), and for the following reasons, this court respectfully requests the instant appeal be denied.

## II. ISSUES RAISED BY THE DEFENDANT

(1) Whether the trial court erred by not suppressing defendant's clothing when police collected that clothing from a hospital where defendant was receiving treatment and did so without a warrant at a time when an exception to the warrant requirement did not exist.

(2) Whether the evidence presented by the Commonwealth at trial was sufficient to sustain the convictions for arson and related charges when the reasonable inferences to be drawn from the evidence presented at trial are equally consistent with the possibility that someone other than defendant started the fire.

(3) Whether defendant's convictions are against the weight of the evidence when the evidence presented at trial allows for the possibility that another individual caused the explosion and/or ignited the fire that destroyed the building at 100-104 North Ninth Street, Reading, Pennsylvania.

(4) Whether the sentencing court erred by imposing consecutive sentences on Count 1: arson and Count 6: criminal mischief when the criminal mischief count arose from the arson and the two offenses differ only in degree and constitute one act.

---

reasons. The year was 2010, not 2009. Also, the official court reporter filed an amended notice of lodging of transcript to reflect the actual date of lodging, that being January 22. Transcription took longer than usual due to a technical problem.

(5) Whether the sentencing court erred by imposing an aggravated range sentence on Count 1: arson.

(6) Whether Count 5: causing or risking a catastrophe merges with Count 1: arson for sentencing purposes.

## III. ANALYSIS

### 1. *Suppression*

Exigent circumstances justified the warrantless search and seizure of the clothing of a gunshot victim, not yet a suspect, for the purposes of ascertaining the identity of the gunshot victim and facilitate investigation of the attack. *Commonwealth v. Johnson,* 969 A.2d 565 (Pa. Super. 2009) (distinguishing *Commonwealth v. Silo,* 480 Pa. 15, 389 A.2d 62 (1978)). In *Silo,* suppression was required because Silo was a suspect in the death of his mother at the time of the warrantless search of his clothes at the hospital. *Silo, supra.*

At the pretrial hearing, Officer Matthew Schappell testified that he went to Reading Hospital and Medical Center at approximately 11 p.m. on June 18, 2006 and 1 a.m. on June 19, 2006 and was instructed to wait at the hospital with a burn victim until the victim was transported to another hospital. Findings of fact, conclusions of law, 6/10/2009, p. 1. After the victim was transported elsewhere, hospital staff asked Officer Schappell if he wanted to take the victim's clothing. *Id.* at 1-2. Officer Schappell took the clothing, unsure of its evidentiary value; if the clothing were left at the hospital, it may have been thrown away or destroyed. The burn victim was the

defendant. *Id.* at 2. Because the defendant was not yet a suspect at the time of the seizure, the warrantless seizure of the clothing was justified by exigent circumstances.

## 2. *Sufficiency of the Evidence*

### i. Arson

In order to sustain conviction for arson endangering persons, 18 Pa.C.S. 3301(a)(1), the Commonwealth must establish beyond a reasonable doubt that the defendant intentionally set a fire or caused an explosion, whether on his own property or that of another, which recklessly placed another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire (section 3301(a)(1)(i)), or when done with the purpose of destroying or damaging an inhabited building or occupied structure of another (section 3301(a)(1)(ii)).

In order to sustain conviction for arson endangering property, 18 Pa.C.S. §3301(c), the Commonwealth must establish beyond a reasonable doubt that the defendant intentionally set a fire or caused an explosion, whether on his own property or that of another, with the intent of destroying or damaging a building or unoccupied structure of another (section 3301(c)(1)), or thereby recklessly placing an inhabited building or occupied structure of another in danger of damage or destruction (section 3301(c)(2)).

There was sufficient evidence to sustain conviction for arson endangering persons and arson endangering

property where lieutenant in fire marshal's office testified that fire was started intentionally with open flame and that man fitting defendant's description was seen running out of home at time of fire. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988).

In this case, the fire placed police and firefighters in danger of death or bodily injury as well as occupants of 100-104 North 9th Street. The fire also placed inhabited buildings in danger of damage or destruction. Marshal Iaeger testified that this fire was set, a conclusion which was based on the presence of gas containers and elimination of other possible ignition sources. The defendant was observed at the scene by multiple witnesses and was badly burned. A glove containing the defendant's DNA was found on Washington Street; a matching glove was found on the roof of building where the fire originated. The defendant's boots tested positive for gasoline. The evidence is sufficient for the jury to infer the fire was set by the defendant.

## ii. Risking a Catastrophe

In order to sustain conviction for causing or risking a catastrophe, 18 Pa.C.S. §3302(b), the Commonwealth must establish beyond a reasonable doubt that the defendant recklessly created a risk of catastrophe in the employment of fire, explosives or other dangerous means. "Catastrophe" is intended to be synonymous with "widespread injury or damage." *Commonwealth v. Karetny*, 583 Pa. 514, 880 A.2d 505 (2005). Where a building with only one occupant was set, but the fire could have spread to a connected building with more than one hundred

people inside, conviction for risking catastrophe was upheld. *Commonwealth v. John,* 408 Pa. Super. 234, 596 A.2d 834 (1991).

The defendant's action of setting fire to 100-104 North 9th Street also placed persons in adjacent buildings at risk or injury and placed those buildings in risk of damage. The fire placed Dale Kite, George Butler and the other occupants of 841 Washington Street at risk. The fire also risked damage to the building at 841 Washington and other adjacent structures.

## iii. Criminal Mischief

To sustain a conviction for criminal mischief, the Commonwealth must establish beyond a reasonable doubt that the defendant damaged tangible property of another intentionally, recklessly, or by negligence in the employment of fire, explosives, or other dangerous means defined by section 3302(a). 18 Pa.C.S. §3304. The evidence was sufficient for the jury to conclude the defendant set the fire to the buildings located at 100-104 North 9th Street, causing damage.

## iv. Recklessly Endangering Another Person

To sustain a conviction for recklessly endangering another person, the Commonwealth must establish beyond a reasonable doubt that the defendant recklessly engaged in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S. §2705. This conviction merged with arson for sentencing purposes; the evidence being sufficient to

sustain the arson convictions, it is likewise sufficient to sustain the reckless endangerment conviction.

### 3. *Weight of the Evidence*

The weight of the evidence is exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. McCloskey,* 835 A.2d 801, 809 (Pa. Super. 2003). "A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to [support] the verdict, but contends, nevertheless, that the verdict is against the weight of the evidence." *Commonwealth v. Davis,* 799 A.2d 860, 865 (Pa. Super. 2002). Whether a new trial should be granted on grounds that it is against the weight of the evidence is addressed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Id.* In determining whether the verdict is against the weight of the evidence, the role of the trial court is to determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Widmer,* 560 Pa. 308, 320, 744 A.2d 745, 752 (2000). (citations omitted) Stated more concisely, the verdict should not be disturbed unless it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Miller,* 555 Pa. 354, 367,724 A.2d 895, 901 (1999).

In this case, the jury found the evidence and testimony presented by the Commonwealth's witnesses to be credible as to arson and related counts. The court does

not find that the verdict was so contrary to the weight of the evidence that it shocks its sense of justice.

## 4. *Sentencing*

### i. Consecutive Sentences

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Burkholder,* 719 A.2d 346 (Pa. Super. 1998). This discretion is permitted because the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. *Commonwealth v. Mouzon,* 571 Pa. 419, 812 A.2d 617 (2002).

An appellate court will not disturb the lower court's judgment absent a manifest abuse of discretion. In order to constitute an abuse of discretion, a sentence must either exceed the statutory limits or be so manifestly excessive as to constitute an abuse of discretion. Further, a sentence should not be disturbed where it is evident that the sentencing court was aware of sentencing considerations and weighed the considerations in a meaningful fashion. *Commonwealth v. Fish,* 752 A.2d 921, 923 (Pa. Super. 2000). (citation and internal quotations omitted) A challenge to an alleged excessive sentence is a challenge to the discretionary aspects of sentencing. *Commonwealth v. Ahmad,* 961 A.2d 884, 886 (Pa. Super. 2008). A challenge to the discretionary aspects of the sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute. *Id.* A chal-

lenge to discretionary aspects of a sentence must present a substantial question as to the appropriateness of the sentence under the Sentencing Code, 42 Pa.C.S. §9781(b), in order to be reviewed. *Id*. "Long-standing" precedent provides that any challenge to the exercise of discretion enjoyed by a trial court in imposing a sentence consecutively or concurrently fails to raise a substantial question. *Commonwealth v. Pass*, 914 A.2d 442, 446-47 (Pa. Super. 2006).

The defendant fails to raise a substantial question for review. This claim of error is a challenge to this court's discretionary decision to impose consecutive rather than concurrent sentences.

## ii. Aggravated Range Sentence

"A sentencing court may consider any legal factor in determining that a sentence in the aggravated range should be imposed." *Commonwealth v. Stewart*, 867 A.2d 589, 592-93 (Pa. Super. 2005). "In addition, the sentencing judge's statement of reasons on the record must reflect this consideration, and the sentencing judge's decision regarding the aggravation of a sentence will not be disturbed absent a manifest abuse of discretion." *Id*. at 593.

During the sentencing hearing, the guideline range was placed on the record as to Count 1, arson, 18 Pa.C.S. §3301(a)(1)(i): offense gravity score 9; prior record score 0; standard range 12-24 months, aggravated range 36 months. (N.T., transcript of proceedings, 10/9/2009, pp. 3, 10.) An aggravated range minimum sentence of 36

months was imposed. The court enumerated the following reasons for the sentences imposed:

"The court here today has considered the age of the defendant and the nature of the offenses. The fact that the arson caused damage to property, that was a true catastrophe that resulted in buildings being destroyed. And as the assistant district attorney stated, that block had not yet been restored.

"The issue the court considers defendant's actions putting firefighters, police officers and citizens at tremendous risk and the court notes that there was an exhibit at the trial of a film and the film showed the coverage at the time of the fire, of the firefighters, of the police officers and citizens, some of whom were there watching. And I'm not concerned about those.

"I'm mentioning people who lived, as the district attorney said, on either side of that building, people who that was their apartment, that was their home. And the court considered the testimony from Mr. Butler who lived in one of the adjacent buildings and according to his testimony was very concerned about another individual there and whether or not that man made it out of the building.

"And the jury heard that. The jury heard all of it and was the basis of the verdict finding the defendant guilty. The facts are undisputed that this was a high population area, that the actions of the defendant put more people than we can count at risk.

"The court has considered the pre-sentence investigation report that was adopted. The court has considered the guidelines that were placed in the record here today.

The court has considered the recommendation—I'm sorry. The court has considered the request for restitution which the defendant has agreed to of the amount stated.

"The court has considered that the actions of the defendant were without any concern on that night for the consequences of his actions and now says he's thankful for the help he received that night. But I didn't hear any remorse for the people whose lives were also threatened but thankfully not taken by his deliberate actions. The court believes that any lesser sentence would depreciate the seriousness of the crimes for which the defendant has been found guilty.

"The court did consider the recommendation from the district attorney, the recommendation from defense counsel, as well as the testimony of Mr. Keenan's father. The fact that the defendant has no prior record is being considered in that guideline ranges that were placed in the record. The court has considered all of those ranges and is satisfied that the sentence imposed is necessary. And for those reasons, the court will enter the following orders." (N.T., 10/9/2009, pp. 14-16.)

Due to the court's consideration of numerous reasons for the sentence, imposition of an aggravated range sentence for Count 1, arson, did not constitute an abuse of discretion.

### iii. Merger

The defendant did not seek merger of Count 1, arson, and Count 5, causing or risking a catastrophe, at sentenc-

ing or in his post-sentence motion; it is being asserted for the first time on appeal. This issue has been waived by the defendant. Pa.R.A.P. 302(a).

The claim is also without merit. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Commonwealth v. Baldwin,* 985 A.2d 830, 2009 WL 5067544 (Pa. 2009) quoting *Blockburger v. United States,* 284 U.S. 299 (1932). Counts 1 and 5 do contain additional elements. Count 1, arson, 18 Pa.C.S. §3301(a)(1)(i) requires that, to be found guilty, the defendant set a fire which recklessly places another person in danger of death or injury. Risking a catastrophe, 18 Pa.C.S. §3302(b), requires the defendant recklessly create a risk of widespread injury or damage by employment of fire or explosives. The element of risk of widespread injury or damage precludes merger.

For all the above-mentioned reasons, the court respectfully requests the defendant's appeal be denied.